UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SILVERIO AZAMAR, et al.,          .
                                  .
        Plaintiffs,               .
                                  .  CA No. 08-1052
    v.                            .
                                  .
STERN ENTERPRISES, INC.,          .  Washington, D.C.
et al.,                           .  Friday, October 1, 2010
                                  .  10:07 a.m.
        Defendants.               .
                                  .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:              GREGG C. GREENBERG, ESQ.
                                Zipin Law Firm, LLC
                                8403 Colesville Road
                                Suite 610
                                Silver Spring, Maryland 20910
                                301-587-9373


For the Defendants:             ROSS D. HECHT, ESQ.
                                Law Offices of Ross D. Hecht
                                14749 Main Street
                                Suite 7
                                Upper Marlboro, Maryland 20772
                                301-952-0262


Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                Official Court Reporter
                                U.S. Courthouse, Room 6714
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                202-354-3186



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

1                                  P R O C E E D I N G S

2          THE DEPUTY CLERK:  Your Honor, we have civil action

3  08-1052, Silverio Azamar, et al., versus Stern Enterprises,

4  Inc., et al.  We have Mr. Greg Greenberg representing the

5  plaintiffs, we have Mr. Ross Hecht present representing the

6  defendant.  We also have Mr. Leon Stern present.

7          THE COURT:  All right.  Everybody have a seat, please.

8  We're here today because of the mess that this case is in.

9  There have been prior occasions where I have been concerned

10  about the progress of this case, but it's come to a head now.

11  And really as a result of discovery, interrogatories, and

12  document requests that were served back in December, I think,

13  and to which there wasn't much response, but we delayed, and

14  plaintiff through Mr. Greenberg was willing to delay while

15  Mr. Stern found counsel.

16    And that brought Mr. Hecht into the case.  I think

17  eventually an appearance was entered in April on behalf of

18  Mr. Stern.  And so matters then ensued, not completely smoothly

19  but nonetheless the case was moving forward.  But then, by the

20  time July came around we had a problem with discovery, a problem

21  with the responsiveness of Mr. Stern and his counsel to

22  discovery, and it prompted an order that I issued in late June

23  setting out some of the difficulties that I was facing in trying

24  to resolve a discovery dispute, and difficulties in

25  communicating with defendant and his counsel.

Case 1:08-cv-01052-JDB   Document 76   Filed 08/03/11   Page 3 of 42

3

1       And we had a hearing on July 2, and some failures to appear

2   at that, and eventually I issued an order allowing another

3   chance to respond to that discovery by not later than July 16.

4       That deadline passed.  I was informed that that deadline

5   had passed with no response, and I issued an order setting I

6   think an August 2 deadline for sanctions motions to be filed

7   with an August 16 response time.  A motion was filed but there

8   was no response filed.  I then eventually issued an opinion and

9   order on September 21 granting plaintiff's motion for discovery

10  sanctions and entering a default against Mr. Stern.

11      I was then contacted -- chambers was then contacted by

12  Mr. Stern objecting to the entry of default and explaining his

13  perspective on why the situation had gotten where it apparently

14  had gotten.

15      And quite frankly, from Mr. Stern's perspective, he felt

16  that the blame was more on his attorney's shoulders than on his.

17  And as a result, I decided that I needed to bring everybody in

18  to see where we were and where we're going.  And that resulted

19  in all of your being here today.  And I appreciate the fact that

20  everyone is here today.  I had some doubts as to whether that

21  would be the result, but I'm glad to see that we're all present

22  today.

23      Now I have to figure out what in the world is going on and

24  how I can fairly and appropriately resolve the pending matters

25  in this case given the fact that I have entered an order finding

1    Mr. Stern in default, and that I'm assuming that the plaintiff

2    believes that that order should remain in place.

3         But what I think I'm going to do is hear from everyone, I'm

4    sure, but we're going to do so in a reasonable way.  And we're

5    going to start I think not with Mr. Greenberg, because I know

6    where things stand with respect to Mr. Greenberg.  What I don't

7    know is where things stand with respect to Mr. Stern and his

8    counsel, Mr. Hecht.

9         So I think what I'd like to do is hear first from Mr. Hecht

10   as counsel for Mr. Stern.  And then if Mr. Stern feels that he

11   has to add something, I will allow Mr. Stern to add his

12   perspective.

13        Mr. Hecht, at the moment, there is an order in place that

14   is basically a sanction for discovery failures that enters

15   default against Mr. Stern.

16             MR. HECHT:  Thank you, Your Honor.  Your Honor, may it

17   please the Court, because I am still duty bound to protect

18   attorney-client privilege, I would like to address the issues

19   relative to the default, and then, if things go further than

20   that, then perhaps we might want to speak to the Court ex parte.

21             THE COURT:  We'll see where we go.

22             MR. HECHT:  Very good, Your Honor.  Your Honor, I'd

23   like to ask the Court to consider --

24             THE COURT:  And Mr. Stern, you should know that when

25   Mr. Hecht makes that observation and request, he's doing so to

1    protect your rights, to prevent any disclosure with respect to

2    conversations and incidents between you and Mr. Hecht.  He's

3    trying to prevent any disclosure to the other side.  So he's

4    raising something that's designed to protect your interest and

5    rights.  Mr. Hecht?

6           MR. HECHT:  Thank you, Your Honor.  Your Honor, what

7    I'd like to address the Court on specifically is the request to

8    consider vacating the order of default because it is our

9    humble --

10          THE COURT:  This is a request you're making now.

11          MR. HECHT:  Yes, Your Honor.

12          THE COURT:  Haven't made up until now.

13          MR. HECHT:  I had not, Your Honor.  My client and I

14   are having a good deal of friction, Your Honor.  But as to the

15   merits of the Court's discovery order, and I don't think

16   Mr. Greenberg will dispute, June 24, Your Honor, I sent draft

17   unsigned interrogatory responses to counsel, with a comment, "My

18   sincere apologies.  Please note these documents are in draft

19   form."  I then indicate Mr. Stern had missed a couple of

20   meetings.  I hope to have him in the office to execute them.  So

21   back in June we filed responsive answers, Your Honor.

22          THE COURT:  No.  You filed unresponsive answers

23   because they were in draft form.

24          MR. HECHT:  They were.

25          THE COURT:  And nothing has ever been done to take

1    them out of draft form.

2            MR. HECHT:  Actually -- thank you, Your Honor.

3            THE COURT:  At least nothing I know about.

4            MR. HECHT:  And that's why I'm a little baffled, but I

5    brought my paperwork.  So June 24, still within the Court's time

6    frames, we give draft answers because if I can't have my client,

7    I still want to be as responsive as possible.  July 27,

8    Your Honor, my client came into my office.  We spent

9    approximately two to three hours doing final production.

10           At that stage, on July 28, I have a fax cover sheet and a

11   confirmation where I send over the executed pages.  And I put in

12   my cover sheet, "The complete and final answers to

13   interrogatories and document responses were sent via e-mail,"

14   because they were lengthy, Your Honor.  Because when Mr. Stern

15   came in, a lot of the answers which I'd provided in somewhat

16   summary fashion, he gave fantastic answers.  In fact, more of a

17   mathematical issue, that these plaintiffs could not have

18   achieved 40 hours because the store was only open six days a

19   week, and from the time the restaurant closes to the time they

20   open in the morning is only six hours.  6 times 6 is 36.  Made

21   some really good points.

22           Anyway, I fleshed all that out in the responses.  I sent

23   that over to counsel, and then I followed it up with an

24   apologetic phone call to Mr. Greenberg, and I said I'm sending

25   this stuff over.  And he said, I understand, I'm still going to

1    seek sanctions because it's untimely.   July 28 is untimely

2    pursuant to the Court's order.

3        I said I understand.   And I anticipated that he would file

4    a sanctions motion seeking attorneys' fees, which my client

5    would have to bear the brunt of because this has been a

6    continuing problem in this litigation.

7        My understanding, because when I spoke to your chambers,

8    was I think he had until August 2 to file the motion for

9    sanctions and did not.   He obtained leave of court and filed it

10   at the end of the month, August 31, is I think when the

11   sanctions motion actually came in.   I actually did not see it,

12   because apparently there was some issue with my BlackBerry not

13   transmitting my messages.   So I corrected that.

14       But when I spoke to your chambers, your madam clerk

15   indicated that I believe he had been granted leave to file the

16   motion for --

17            THE COURT:   Sanctions motion was filed on July 19.

18            MR. HECHT:   Your Honor, I --

19            THE COURT:   That's what the docket reflects.

20            MR. HECHT:   If it does, then I don't dispute that.

21   But that's what I understood, that he had sought leave.   But I

22   had not seen that sanction coming, but I still anticipated that

23   again it would be for attorneys' fees.   But in terms of the

24   merits of honoring our discovery obligations, as the Court knows

25   from the two times we were here, even before we had gotten any

1   headway on the discovery, I provided counsel *sua sponte* with

2   everything I had responsive-wise document-wise.

3       And that was everything -- he's a Coverall franchisee.  I

4   gave him all the Coverall documentation, all of the invoicing

5   where Coverall would send him his monthly earned checks, and

6   anything that we had, I provided even before filing responses.

7   And for most of the requests for production of documents, our

8   answer is no such documents, because this is a lawsuit about

9   overtime and about Fair Labor Standards Act.  And normally

10  you're going to have punch cards, you're going to have W-2s.

11      My client has always contended that Silverio Azamar was an

12  independent contractor and everyone flowed through him.  So most

13  of our answers are no such documents, no such documents.

14      The only item that was responsive to the document request

15  was we had indicated that he had paid Mr. Azamar in check form.

16  And again, his contention was the burden was on Mr. Azamar to

17  distribute the money to his employees or subcontractors.  Those

18  checks came in later, after we had responded.  That's the only

19  discovery that I think is responsive to all of the requests that

20  we hadn't already provided.

21      So in terms of prejudicing the plaintiff, Your Honor, we

22  believe we provided the plaintiff with everything necessary and

23  responsive to their requests.  The answers to interrogatories I

24  think are fully illuminated by the July 28 filing, or 27th with

25  the fax on the 28th.  And the documents were either provided

1  significantly in advance -- I think at the status we had before

2  Your Honor, even before the July one, Your Honor, I provided the

3  discovery to counsel out in the hallway.  So really in terms of

4  what discovery had not been provided, it was those two checks,

5  which have been provided to counsel.

6      Your Honor, I think -- the Court knows that counsel has had

7  a good bit of difficulty marshaling this case.  Part of it is

8  issues with counsel and client, but we had a very vigorous

9  discussion in the lounge, and we don't see eye to eye on a

10  couple of critical issues.  The fees that counsel would charge

11  and should charge to bring this case from its posture all the

12  way forward, the obligations of the client to counsel, not just

13  in terms of monetary but in terms of meeting the obligations

14  that the Court imposes, the discovery requests.

15      I think I had alluded to the checks probably back in March

16  or April.  We had a dispute.  I actually opened my e-mail and

17  showed my client that I had sent him several requests.  He said

18  he didn't get them because he's, in fairness to him, he's more

19  of a hands-on kind of a guy and his wife is the electronics

20  person in the family.  But we just have fundamental issues about

21  communication and the ability to work together to do what is

22  necessary.

23      So, Your Honor, I think what would probably be appropriate

24  would be to consider striking out the default.  I think if some

25  sanction is merited, it would probably I think maybe be the cost

1    of attorneys' fees for the preparation of the motion.  But the

2    meat and potatoes of discovery was provided, I would argue, and

3    certainly as far as June, and the answers to interrogatories

4    were really cleared up with his answer about how it was a

5    mathematical impossibility for these folks to hit the overtime

6    numbers.

7         That still isn't going to explain away some of his

8    obligations under the Fair Labor Standards Act to keep records

9    and things like that, and some of the local laws regarding

10   withholding for workers' compensation and things like that.  So

11   it's not a complete answer or a complete defense, but it goes a

12   long way.

13        But I think also fundamentally, Your Honor, I think it

14   would probably be appropriate if I withdrew as counsel and

15   Mr. Stern be permitted to obtain other counsel.  He says

16   economics are not the issue, and I have to respect my client

17   when he says that, so I have to assume it's just a

18   irreconcilable difference between our personalities.  We were in

19   the anteroom having a very vigorous discussion about when items

20   were requested, when they were provided, meetings made, meetings

21   broken.  And we're just not seeing eye to eye.

22        And I think my client feels like I'm not moving the ball

23   forward.  Obviously, I would probably say the same thing.  But

24   again, I don't want to go into attorney-client privileged

25   conversations.

1    But if we're having this kind of a fundamental issue,

2    Your Honor, then I think, in fairness to Mr. Stern, considering

3    that discovery has been provided, that the Court consider

4    allowing him to -- well, most primarily I think we would ask the

5    Court to vacate the order of default, but allow me to withdraw

6    and let him seek counsel of his choice.  He said that he had

7    spoken with three or four other attorneys prior to coming to my

8    firm, so clearly Mr. Stern appears versed in the procedures

9    necessary to retain counsel.

10    But if we're having this much of a conflict, Your Honor,

11    then I'm probably just not the guy for him.  If we were to

12    switch to ex parte, Your Honor, I can show the Court work

13    product drafts --

14          THE COURT:  We don't have to go there for the moment.

15          MR. HECHT:  -- which fall within the time frames the

16    Court had originally set out.  But if the fault lies with

17    counsel, because he and I just don't see eye to eye, then that

18    shouldn't prejudice Mr. Stern if his good-faith belief is that

19    he put the tools in my hand and I'm not using them.  I would

20    respectfully disagree or say that if he did put the tools in my

21    hand, he put them in late, that this case has been a mess on

22    Your Honor's docket.

23          THE COURT:  Let me ask you this, Mr. Hecht, which

24    moves a little bit beyond the discovery responses.  And you've

25    said one or two things that allude to this, but I'd like to ask

1    you a specific question.  And that is, as an attorney appearing

2    in this case and representing Mr. Stern, why is it that there's

3    been no response filed to a motion for sanctions which sought a

4    default judgment, that was filed, according to the Court's

5    records on July 19, and according to your memory on August 31,

6    but of course we're more than a month --

7              MR. HECHT:  Yes, Your Honor.

8              THE COURT:  -- just over a month from then.  Why is it

9    that no response has ever been filed to that?

10             MR. HECHT:  I had not seen that document come in.

11   When I spoke to Mr. Greenberg, he said he was going to file it,

12   and normally I see it in the electronic filing system.  I did

13   not see it --

14             THE COURT:  Haven't seen it.  You're saying that --

15   what does "I haven't seen it" mean?  Are you saying that it

16   didn't get filed electronically?

17             MR. HECHT:  No, no.  Meaning that through my e-mail I

18   did not see it when it initially came in.

19             THE COURT:  I have a vague recollection that when we

20   had a problem back in July or June, that I heard some story

21   along these same lines from you about not getting messages, not

22   seeing things.

23             MR. HECHT:  I think those were the notices to have a

24   telephonic conference, Your Honor, and I think the issue at that

25   stage, which actually has carried through all the way through

1   the month of July and August, was I don't know -- when we were

2   here July 2, Your Honor, I had talked about a family illness.

3   My stepfather actually -- when Your Honor said July 2, he

4   actually passed away that evening from a long bout with cancer.

5   So I was out of the office for most of July.

6       Then my ex-wife, who resides in New York with my children,

7   at middle of August had to have emergency surgery for a healthy

8   42-year-old.  Had to go to New York, take my minor children,

9   take them.  My ex-wife was in the hospital for a period of about

10  10 days.  And then at that same time, right around, I want to

11  say August 9, my current wife was diagnosed with a very

12  aggressive form of cancer.  So I hit the Trifecta in terms of

13  personal issues, Your Honor.

14      And for most of the month of July and now most of the month

15  of August, I did very little work because I had to attend to

16  personal issues.  With most of my other cases, I was able to

17  extend deadlines, all my criminal cases, if there weren't speedy

18  trial issues or people in custody, was able to move those.  But

19  with Mr. Stern, a lot of our issues are we need to get together,

20  we need to address this issue.  And that goes back to our

21  communication issues.

22      When I did see the order of default, we had an exchange of

23  voice mails where I said all right, well, call me.  We need to

24  get together to address this.  And again, I don't know if it's

25  that he works a night schedule, but we're not ever able to seem

1   to get together to be able to be responsive to this.

2       The other issue that we have, Your Honor, is that I have

3   said to my client I will do everything that I'm charged with

4   doing, but you have a couple of obligations.  One is financial,

5   the other being these discovery productions that allow me to do

6   my job.  And that's where we've had so much friction,

7   Your Honor.

8       So to the extent I could, I moved the ball forward with

9   regard to the discovery from July 2 all the way through, and

10  it's still an ongoing issue.  My ex-wife, I've returned my minor

11  children back up to her September 4, I believe, is when I drove

12  the children back up.  But now my wife is dealing with an

13  aggressive form of cancer that has kept me out of the office

14  much more than I would like.  Not to the point that I'm seeking,

15  you know, to go to inactive status, but I've had her to numerous

16  specialists, we go to Hopkins next week for a second opinion.

17  It's been very difficult in that sense, and for that I have to

18  take responsibility.

19      July and August were essentially lost months for me.  Some

20  of the judges in Prince George's County where my office is know

21  my wife's situation and have been very tolerant.  This court

22  doesn't.  But I would say that probably more than anything --

23  and the information not forwarding to my BlackBerry for whatever

24  reason kept me from being aware of the sanctions motions until I

25  saw the order of default, and then again Mr. Stern and I were

1    reaching out to each other to get together so I could file a

2    response to this.

3        But counsel also wants client to meet other obligations,

4    financial, and it becomes a little bit of chicken and the egg.

5    I will help you but you need to help me, and then --

6        THE COURT:  Well, it is a little bit of chicken and

7    the egg.  And those are difficulties.  And first of all, let me

8    say with respect to your personal and family situations, I'm

9    sorry to hear that, and certainly those are things that call for

10   some flexibility and appreciation by the Court and others in

11   working with people.

12       But there's always the phone call or there's always the

13   filing that can say I need more time, I've got these problems

14   that I have to deal with.  But none of that happened here.

15       MR. HECHT:  Correct.

16       THE COURT:  That, quite frankly, if it was only once,

17   if it was only short-term, I would be much more understanding of

18   it.  But here it seems to be something that's happened back in

19   July, and you've got your explanations -- I mean back in earlier

20   context about the discovery matters, and then more recently in

21   this context, which is just an extension of the same things.

22       But I have to say I'm troubled, even though I appreciate

23   the explanation that you've provided.  It seems to me that

24   there's always the responsibility in representing your client

25   and as an officer of the court to make sure that something gets

1    filed that asks for more time at a minimum.

2         All right.  Mr. Stern, I'm going to now hear from you, but

3    I want you to understand that what I'd like to hear from you is

4    not too much of the details of your discussions with Mr. Hecht

5    in terms of any problems, because I don't want you to be

6    inadvertently disclosing any confidential information.  I really

7    want to hear more in the same vein that I've heard from

8    Mr. Hecht about where you think things stand and what your

9    request of the Court is.

10             MR. STERN:  Yes.  When we met the first time when I

11   came in here, counsel was informed that Coverall need to be

12   brought into it.  The other side had to answer some

13   interrogatories, and we would answer their interrogatories.

14   Counsel had told me he would do that for $5,000, and then he

15   would work out a payment plan.  I said fine.  Give it to me so

16   we'll know.

17        I never heard anything else about finances.  I kept asking

18   him.  I only met with counsel every time we come to court.  I

19   call him.  He lives less than 10 minutes.  When I do my daily

20   walk to walk around the courthouse, I always swing through his

21   office.  He's only 10 minutes from my house, and I walk past his

22   office daily, and I have been unable to reach him.

23        I got the witnesses, all of them.  We've been past his

24   office.  We've made arrangements, it was canceled out.  Every

25   time I try to get in contact with him, no phone calls.  I call,

1    no phone calls.  Next thing I see is this mail coming in like

2    it's this.  Now, the communication is the problem, you know.  I

3    have been unable to reach this man.  He's saying to me that he's

4    sending me e-mails.  Not so.  My wife checks them every day,

5    okay?  And it's not so.

6        You know, all I want him to do is communicate with me and

7    do what he said.  When I walked into his office and the day he

8    came in front of you, Your Honor, he told you it was a third

9    party involved, and you told him you would give him 30 or 60

10   days to get Coverall brought into this.  He hasn't done it.  The

11   interrogatories for the other side to answer, hasn't done it.

12   Those were the things that he took my money for that he said he

13   would do, and that would cover it, and that he would work out

14   payment plans.

15       Nothing.  I haven't signed no papers for him.  He didn't

16   give me no bills, nothing.  He told me his time was $300 an

17   hour.  And what my gripe is, I had no problem with that, but I'm

18   getting blamed for stuff.  When he came in here the second time,

19   I took the fall of saying was unreachable.

20       Your Honor, today it wasn't so.  It was the same problem

21   you got here now.  Communication.  Like I said, it's an easy

22   case.  I mean, documents can show everything.  I got witnesses

23   that Coverall gave us these people that were already in place.

24   All we were supposed to do was manage it.  Coverall supported

25   the money, everything came through Coverall.  Coverall should be

here today.  But we haven't gotten that far because Mr. Hecht

hasn't done it.

And like I said, I have tried every way to reach Mr. Hecht

and Mr. Hecht is not communicating, you know.  I mean, he said

to you the same thing he said the last time with the situation

with his wife.  That has something to do with why we're not

communicating.  But I call, I walk past his office.  He's in the

walking path from my house around the courthouse in Upper

Marlboro every day, and I walk past, I see other people, I speak

to the people downstairs.  They know me now from coming in there

and looking for Mr. Hecht.

But, you know, that's all I have to say beside going into

more detail.  Coverall should be in this situation.  This thing

could be solved and could be over with.  And a case is being

carried on just because the fact that counsel's not doing what

he was asked to do.

THE COURT:  So what do you feel about -- if this case

proceeds further, is it your desire to proceed with Mr. Hecht as

your counsel?

MR. HECHT:  Well, Mr. Hecht told me -- I would want

Mr. Hecht to do three things.  Bring Coverall into it like he

was supposed to brought it in from day one when he told you, in

front of you, that he said it was a third party, that Coverall

needed to be brought into it.  And on your docket you said you'd

give him 30 -- I think it was 30 days or 60 days to bring

1    Coverall into it.  You said it to him, and he said yes.  He

2    hasn't done it.

3         The second thing was to ask the other side some

4    interrogatories, so that they could answer those, and we could

5    get down to everything being settled the right way.  But he's

6    only doing what he wants to do.  But when he took my money, he

7    said he would do this, and then he said he would work out a

8    payment plan.  I haven't met no documents to sign.  And then

9    today, when I see him today, he tells me, kind of angry with me,

10   I owe him $500.  You know, that's the first I hear from him.

11   That's what he tells me out of his mouth.

12        So I'm very upset behind that.  I had to call other counsel

13   because it was unreachable to get to him.  So I started to

14   seeking the other side, other side told me write a letter, put

15   it underneath his door, you know, and I had to threaten him that

16   I was coming down here for him to respond.  I mean, you know, I

17   shouldn't have to go through that.

18        You know, if I'm paying for something, I should be able to

19   communicate with him.  And he's right around the corner.  It's

20   not like he's out of the way.  My time is -- my mornings are

21   free from 6 a.m. in the morning until 7 p.m., and that's when I

22   go to work.  And he's saying I'm unreachable.  That's not so.

23   It's not so.

24             THE COURT:  All right.  Thank you, Mr. Stern.

25        Mr. Greenberg -- Mr. Hecht, go ahead.

1        MR. HECHT:  Your Honor, I want to very briefly address

2    my client's issues.  With regard to finances, Your Honor, I had

3    said I would bill my client hourly.  That was the hourly rate.

4    There was no expectation of I'll do these things for this price.

5    I said we will go down the road together.  I never asked him for

6    $500 today like a shakedown.  My notes from our initial three or

7    four-hour meeting said he was going to try and make payments at

8    $500 per month going forward, which he didn't keep to, but

9    that's neither here nor there.

10       And the other thing is, Your Honor, it almost gives the

11   impression that we live near each other.  My office is on Main

12   Street in Upper Marlboro.  He lives in Upper Marlboro.  Most

13   days, other than the past two months, I'm in court most

14   mornings.  So that's why if he comes by my office, I'm not

15   there, because I'm typically in one of the courthouses in the

16   D.C. or Maryland area.

17       Without going too far into ex parte issues, Your Honor, I

18   printed out my e-mail.  June 17 we started electronically

19   connecting.  I said "Please hit reply."  June 22, I sent a draft

20   complaint over to my client.  I don't want to discuss the

21   details, Your Honor, and I can hand them up for review, but

22   these are printouts from my e-mail account.

23       THE COURT:  Is this on the Coverall aspect?

24       MR. HECHT:  Yes, Your Honor.  June 22, please review

25   counterclaim, and then my thoughts on it.  June 23, please print

1   and review, and the attachments, one is the counterclaim, the

2   June 23 attachments are the responses.  Because I know they're

3   due and owing.  I couldn't get with my client so I went ahead

4   and sent the draft ones to try and keep in compliance.  June 23,

5   please print and review.  They said they didn't get them, I sent

6   them again.

7        And then July 28, right after we met, I sent him a

8   follow-up e-mail saying give me the names and contact

9   information for all the key people.  And then he said he would

10  bring them to my office.  He says that I canceled one meeting.

11  By my notes, he canceled several others, Your Honor.

12       So, I mean, in terms of work product, I have a draft that's

13  been drafted since -- you know, a semi version since June 22

14  that, again, some of the economics, some of the communication

15  issues.  As Mr. Stern's counsel, it does appear that he has good

16  defenses to this issue.

17       As I told the Court, and I don't know if Mr. Stern grasps,

18  Coverall has a -- I don't want to call it ironclad, but they

19  have a very strong franchisee agreement whereby if he sues them,

20  A, it has a mandatory arbitration clause, and B, it is a

21  fee-shifting burden.  And I've explained to him that this

22  complaint is going to have to be just right or they're going to

23  bury you.  And your first obligation is to pay your counsel, let

24  alone having to pay Coverall's counsel to go forward.

25       And Mr. Stern kind of thinks that by saying well, do it, I

1   can just do these things magically.  And I can't.  I need time

2   with him to prepare.  When we sat down for the two or three

3   hours to amend the interrogatories and give these fleshed out

4   mathematical explanations, that covered, I think, a lot of the

5   issues related to the plaintiff.  But his desire to bring in

6   Coverall still requires time and effort, and that translates

7   into fees.

8       I don't have an -- you know, I know that these were sent to

9   his wife because I had asked her to hit reply.  I don't know if

10  she showed them to him or didn't show them to him, but you can

11  see there's some sort of fundamental disconnect between us.  And

12  as counsel you can only do so much, because it's not personal to

13  me.  I don't know the details the way Mr. Stern does.  And it

14  appears that he has meritorious claims, Your Honor, but bringing

15  them to the table has been difficult, and just perhaps I'm not

16  the right guy for Mr. Stern.

17      But it does appear his claims have merit.  I don't think

18  there's any Rule 11 issues here.  I don't think any of this is

19  frivolous in terms of his claims.  There's real meat on the bone

20  there.  But the problem is --

21          THE COURT:  The problem is that none of it has been

22  offered.  That's the difficulty.  You may have discussed it, you

23  and Mr. Stern may have discussed it, but none of it has been

24  filed.

25          MR. HECHT:  Right.  That's true, Your Honor.  You

1    know, these documents were drafted a while ago, and I can

2    certainly print them.  But I'm even happy to turn them over and

3    let him take them to new counsel and then develop them further.

4    But between us, there's an idea that -- it was never this I'll

5    give you X number of dollars, do this.  As Your Honor knows,

6    especially with large-scale federal court litigation, it's

7    hourly, and this case was significantly more complex than

8    Mr. Stern, when he first let on, he's like oh, it's no problem,

9    just drag Coverall into this.

10        I have their franchise agreement.  There's a good bit of

11   information in there.  I've had to do research.  They have been

12   sued in other jurisdictions for the same issue.  The state of

13   Massachusetts went after them.  There's issues there.  But this

14   is much more complex than I think Mr. Stern realizes, and

15   therefore the time involved is much greater.

16        And Mr. Stern kind of, I think, has this idea that I paid

17   you this money, you have to take it and take it to the

18   gatehouse.  And it's like, no, Mr. Stern, we need to keep going

19   forward together.  We need to have a series of meetings.  And

20   I'm sorry that it hasn't been a more productive relationship,

21   Your Honor.  But as to Mr. Stern standing before the Court, I

22   would hope that the Court would strike out the default and

23   either allow him to -- I think he should retain new counsel.  If

24   you hear, Your Honor, there's a lot of hostility between us, and

25   the expectation levels are pretty far apart.

1          THE COURT:  Yeah, but basically, what you and

2     Mr. Stern I think would be requesting is let's simply go back to

3     whatever point in time it was and start over again, get new

4     counsel, have the things filed on Mr. Stern's behalf, vacate the

5     default, and effectively act as if none of this has occurred.

6     Well, that may be, but I think Mr. Greenberg might be heard on

7     that.

8          MR. HECHT:  Yes, Your Honor.  We have complied with

9     discovery, so I think that part is in the books already.  And,

10    you know, to the extent that the Court wanted, I would even file

11    the complaint which I have drafted, and then withdraw, so we can

12    start to bring in this other party.  But certainly let the Court

13    hear from Mr. Greenberg.

14          THE COURT:  All right.  Thank you, Mr. Hecht.

15    Mr. Greenberg, what do you make of all this?

16          MR. GREENBERG:  I think first and foremost,

17    Your Honor, I don't have a dog in the fight between Mr. Stern

18    and Mr. Hecht, and whatever is going on in their relationship is

19    frankly none of my business.  My limited dealings with

20    Mr. Hecht, if I e-mailed him or left a message at his office, I

21    got a call back.  So I don't know what's going on there and I

22    don't think I want to comment on it.

23         But as far as what's going on with the entry of default, I

24    think we need to look at this case and realize that about two

25    years ago I filed suit on behalf of about 11 individuals that

 1    performed work duties and simply were not paid.  It's not just

 2    an overtime issue, it's an FLSA minimum wage issue as well as

 3    the ethical state, whether it be D.C. or Maryland, nonpayment of

 4    wages.  So, you know, he may think he has a defense to overtime,

 5    but these folks haven't even been paid.

 6         And to that end, I would say way back in 2008 or 2009, I

 7    filed discovery.  I was met with eventual Rule 11 sanctions

 8    against me by Mr. Stern, and motion to dismiss filed by

 9    Mr. Stern, which I had to respond to.  I've been to this court

10    for status hearings and listened to explanations as to why

11    defenses haven't been met, counsel hasn't been retained,

12    discovery hasn't been produced.  And I've been here four or five

13    times.  I'm sure it's in the Court docket how many times I've

14    been here, never for anything substantive.

15         Last time we were here, again part of the issue was a

16    failure to respond to discovery.  I believe the electronic or

17    the telephonic meeting that we were supposed to have that

18    brought upon the last time I was down here was again discovery

19    had not been produced.  And Your Honor made clear in no

20    uncertain terms that there would be prices to pay if discovery

21    was not produced before --

22              THE COURT:  Mr. Hecht's position is that discovery now

23    has been produced.  Set aside the timing for a second.

24              MR. GREENBERG:  Yes.

25              THE COURT:  Has discovery been produced?

1          MR. GREENBERG:  Short of a motion to compel as far as

2     fleshing out better answers, I would say about a week and a half

3     or so, whether it be 10 or 12 days after the deadline by which

4     discovery must have been produced, verified interrogatory

5     answers and a supplement to the initial document production was

6     provided to my office.

7          That being said, the issue for my motion for sanctions and

8     request for default was that the generous third or fourth

9     extension given by Your Honor was not met.  And that's why I

10    filed the motion for entry of default.  And you'll note I filed

11    it more or less as soon as I was given permission by chambers,

12    that that date had been missed, and I was invited to file a

13    motion for sanctions.  I did.

14         I've got clients that I'm trying to represent zealously who

15    are calling -- who are unfamiliar with the American court system

16    as it is, let alone what in the world is going on in their case,

17    and I don't have much of an answer for them.

18         THE COURT:  I'm asking the same questions.

19         MR. GREENBERG:  Except for the fact that I'm trying to

20    get them the wages that they worked for.  It's my opinion that

21    The Cleaning Infantry, Inc., who we have a default against, and

22    Mr. Stern qualify as employers under the FLSA and the applicable

23    state laws.  It's my opinion that Coverall does not qualify as

24    an employer.  I think in the U.S. District of Maryland Judge

25    Motz wrote a very strong opinion to that end, either -- it was

1    published on the 27th or 28th, where he deemed, I think it was

2    Comcast --

3            THE COURT:  The 28th of?

4            MR. GREENBERG:  This month.

5            THE COURT:  You mean three days ago?

6            MR. GREENBERG:  Three days ago, where he said -- and

7    it's okay for publication, where under the FLSA they tried to

8    get Comcast as an employer for things that subcontractors did,

9    and Judge Motz said no, you can't do that.  You know, that just

10   reaffirms my opinion that I've got the right folks in this case,

11   and that my clients qualify as employees.  Mr. Stern and

12   Cleaning Infantry are employers, and that they're owed money.

13       But to the -- and I don't think that there's, even in the

14   production or in the discovery responses, there's any good

15   defense to that.  I don't know that a meritorious defense has

16   been raised today.  If we are to interpret what's going on as a

17   motion to vacate the default or to set aside the default, I

18   think a requirement is some level of meritorious defense for a

19   reason we should go back and continue to litigate this case.

20       The fact is that we continue to wait.  Deadlines continue

21   to be missed, and there need to be some level of repercussions

22   for this, whether or not there is a strained relationship

23   between the defendant and his counsel.

24           THE COURT:  All right.  Well, we have a default on the

25   record.  I've heard some explanations.

1          MR. STERN:  I want to reply so I can tell him --

2          THE COURT:  Come on up to the microphone, Mr. Stern.

3          MR. STERN:  He mentioned the Cleaning Infantry, okay,

4    which is another company, and that's the part with the checks.

5    And Coverall, it's two different things here that he's trying to

6    wrap up into one.  And it's not.  It's two different cases here.

7    I'm with Coverall, okay?  Ms. Jackson back there handles the

8    Cleaning Infantry, and she got the checks that show that

9    Silverio, his name, that he was an independent contractor.

10         So it's confusing because they got all of it wrapped up

11   into one, and I had told counsel to make sure they separate it

12   because it's two different things here.  One part, the gentleman

13   only worked 28 days or 26 days before they were kicked out of

14   the TenPenh and these three other restaurants in the D.C. area,

15   it was four restaurants.  That's one slot.  And then the other

16   stuff is dealing with Coverall.

17         So they got both of them all tied up and twisted together,

18   and they're separate items.  And that's where the problem is.

19   He mentioned the Cleaning Infantry, okay, and that's where

20   Silverio, where the checks were paid to the gentleman, and he

21   decided to keep the money himself and not pay his workers.  The

22   other part is Coverall, where Coverall told the workers that

23   they would pay them, and the other workers from the other groups

24   of the Cheesecake Factory that was with Coverall, they got paid.

25   So it's kind of twisted.

```
 1              THE COURT:  Okay.  Thank you, Mr. Stern.

 2              MR. HECHT:  May I address the Court, Your Honor?

 3              THE COURT:  Sure, Mr. Hecht.

 4              MR. HECHT:  As I understand Mr. Stern's defenses,

 5    there's twofold.  With regard to the order of default, it has

 6    always been his contention that he subcontracted with the lead

 7    plaintiff, Silverio Azamar, and that in turn it was Mr. Azamar's

 8    duty to hire one or 100 people, as many as he felt necessary to

 9    accomplish the task of cleaning these restaurants.  So that if

10    that defense is true, and I think we tendered some checks that

11    show that Mr. Stern made bulk payment to Mr. Azamar -- tendered

12    a couple of checks.  Each one is around $3,500, which I think

13    support his contention that I was dealing with a subcontractor,

14    and if these employees, if any employees, are those of

15    Mr. Azamar.

16         So that would I think be a complete defense to the order of

17    default, because counsel is right, you have to demonstrate that

18    you have a meritorious defense.  And I think that would answer

19    that and that would address all of the plaintiffs' complaints,

20    because if they're Mr. Azamar's clients, then he would have all

21    the burdens of record-keeping, making sure there's compliance

22    with local and federal wage and hour law issues.

23         The other issue, which only came out after Mr. Stern spent

24    some time explaining it, and I wish he had documentation to

25    support it, was that -- two factors why we think Coverall is a
```

1    responsive party, is that Coverall tried to -- all of these

2    employees were working at the Cheesecake Factories, which there

3    were five or six of, and Coverall had the master contract for.

4    Coverall tried to raise rates on Cheesecake Factory.  Cheesecake

5    Factory responded by terminating the contract.

6        Then Coverall North America, some of their corporate folks

7    came down to this area and allegedly made promises to Silverio

8    face-to-face and said we promise you that if you all continue --

9    because once they found out the contracts were over and they'd

10   cut off Mr. Stern's funds because of some of these ongoing

11   conflicts, they refused to do work.  And the Coverall North

12   America people came down and proffered that we promise that if

13   you guys continue to do the work, we will pay you.

14       Again, if that allegation is supportable, that would be a

15   responsive reason why that would directly implicate Coverall

16   North America, even though they're a franchisor -- the problem,

17   if it could be developed, is they have this great franchisee

18   agreement, but yet they control the flow of all funds and make

19   determinations about which franchisees keep contracts.  If

20   you're a franchisee, I think the law would show they have to be

21   given the independence to run their franchise.  If you control

22   everything at the corporate level, then I think the franchisee

23   name is just a shadow.

24       And that's one issue we tried to develop.  The other issue,

25   and I didn't understand this again until we did the

1   interrogatories, is that after these Cheesecake contracts

2   folded, Mr. Stern went and got several other restaurants to hire

3   him under this Cleaning Infantry flag.  He had those contracts

4   for approximately 28 days, and then those restaurants weren't

5   satisfied and fired him.  But he also used Mr. Azamar as the

6   primary subcontractor.

7       Again, from counsel's mouth to it bearing out in a motion

8   for summary judgment or a meritorious defense is a long ways

9   away, but I think our answers to interrogatories did identify

10  those issues.  Mr. Stern, even though he's a pro se party, has

11  articulated that issue, even if he doesn't do it very clearly.

12      And so I do think he does have a meritorious defense to the

13  order of default, Your Honor.  And the thought is that he should

14  be entitled to maybe a little more leeway -- and I hate even

15  asking because of the posture we're in -- to try and bring

16  Coverall into this claim.  Of course they're going to turn

17  around and go immediately on the attack with him, I'm quite

18  sure.

19      But from what he has articulated, I think there is a

20  good-faith basis to bring them in.  And my thought, in a perfect

21  world, would have been to take some of the depositions of the

22  plaintiffs.  He has a couple of the other ex-Cheesecake Company

23  franchisee who we've identified by name and information, who

24  were witness to these promises by Coverall.

25      So it's not just wishful thinking on his part, Your Honor.

```
1    I think it's there.  I think, as Your Honor can see, it's a

2    somewhat convoluted and complex issue, and it takes time, effort

3    and money to put it together, and I haven't done a very good job

4    of it.  But I certainly accept some of the blame for this, but I

5    think that should hopefully convince the Court or sway the Court

6    to vacate the default and at least allow him to, if nothing

7    else, allow him to go to a trial before a jury and try and

8    demonstrate his issues with relation to the plaintiffs in this

9    case.

10        He's confident that if he can bring Coverall into this,

11   they're going to sort of step in and clear the table, but I

12   don't have quite that same confidence.

13            THE COURT:  All right.  Thank you, Mr. Hecht.

14   Mr. Greenberg.

15            MR. GREENBERG:  Your Honor, I don't know if this

16   discussion goes beyond what we're talking about today, but to

17   the extent that Your Honor would like to hear my response to the

18   issue --

19            THE COURT:  You can put it on the record very briefly.

20            MR. GREENBERG:  Okay.  The issue as to Coverall kind

21   of goes beyond where we're at.  No doubt that the plaintiffs in

22   this case have the right to bring suit under the FLSA and wage

23   statutes against all of their employers, as it's defined by

24   statute.  I guess the argument that the defendant is trying to

25   make is that Coverall would qualify as another employer.  That
```

doesn't qualify as a defense that he himself, Mr. Stern, is not

an employer.

    The issue as to The Cleaning Infantry, Inc. is really not

up for discussion here or would be moot, as a default has

already been entered against The Cleaning Infantry, Inc.  So the

only issue is whether Mr. Stern himself qualifies as an

employer.

        THE COURT:  Well, there could be an issue, I

suppose -- I haven't thought it through -- but there could be an

issue as to whether Coverall is an indispensable party.

        MR. GREENBERG:  Your Honor, I think that in the

future -- well, I would hope that in the future that wouldn't be

necessary to even address, because I think the default is

proper.  But I don't know that it would be an indispensable

party.  It would just be another employer, and it would be a

strained argument based on recent case law that Coverall could

qualify as an employer, with their limited involvement with the

plaintiffs in this case.

    The issue as to an independent contractor, it's a six-part

analysis set forth by the Supreme Court in the Silk case.  I

don't think that's been addressed at all by Mr. Hecht or

Mr. Stern.  I think a weighing of the factors is going to lead

to the conclusion that these folks were not in fact independent

contractors but were employees.  Their hours were set, the issue

of control, the fact that Mr. Stern's in the business of

1    providing cleaning services to restaurants, and these folks were

2    cleaning for him, are some of the examples of the fact that

3    these were in fact employees.

4        This is not an issue as to whether the proper tax

5    withholdings were taken.  That's beyond my responsibility and

6    that would go more to the IRS.  This is not whether unemployment

7    or workers' comp insurance was taken out.  It's just a matter of

8    whether the wages were paid or the minimum wage or the overtime

9    was paid.  I don't think a defense exists for that.  I think any

10   opportunity for a defense of this as to plaintiffs' claims has

11   already come and passed and there needs to be some sort of

12   resolution.  And I think that has already happened.  And

13   Your Honor gave a well-reasoned opinion and entered the default,

14   and I don't think that should be disturbed.

15           THE COURT:  All right.  Thank you, Mr. Greenberg.

16       Normally I think what I would do is say good day to all of

17   you and I'll issue an order addressing these matters.  But I

18   think it's going to make more sense if I try to tell you some

19   things.  And I'm going to take a five-minute -- we'll make it a

20   10-minute break for the court reporter's benefit, and my own,

21   and then I'll come back and I'll at least make some observations

22   and perhaps set a bit of a schedule for where we're going from

23   here.  So I'll be back in 10 minutes.

24       (Recess from 10:59 a.m. to 11:15 a.m.)

25           THE COURT:  All right.  Mr. Stern, you need to be

1    aware of the fact that you have a right to be represented by

2    counsel of your choice.  So if you wish to have different

3    counsel, and you really haven't spoken directly to that, but I

4    get the sense that you probably would like to have different

5    counsel, and I know we have heard from you in the past that you

6    were looking for different counsel.  If you would like to have

7    different counsel, that is your right and you should exercise

8    that right promptly.

9        And if you do acquire a different counsel, I am going to

10   release Mr. Hecht from this case and allow his motion to

11   withdraw to be granted.  But I'm not doing that quite yet.

12       Mr. Hecht, I would like to receive from you a filing within

13   two weeks that just recounts on behalf of yourself and Mr. Stern

14   the discovery aspect of this; in other words, just the record of

15   what you have done -- what has been done in responding to the

16   discovery request that is the underlying event that has brought

17   us together.  And I put the word "together" in quotation marks.

18       So file that within two weeks, and it should just explain

19   the history that you've explained here today.  And it might

20   attach the relevant materials, to the extent that you have them,

21   in terms of what the discovery requests were and any e-mails,

22   communications, et cetera.  So please do that.

23       Mr. Stern, I'm going to give you 45 days to acquire new

24   counsel and file any motion to vacate the default that has been

25   entered.  I am not vacating the default at this time, but I will

1    give you 45 days to acquire new counsel and file a motion to

2    vacate that default.  If you don't acquire new counsel, you're

3    going to have to, either through Mr. Hecht or on your own, file

4    a motion to vacate the default, because right now that default

5    is in place and it's staying in place unless I vacate it.  And

6    I'm not vacating it until I see a motion and Mr. Greenberg has a

7    chance to respond to that motion with respect to vacating the

8    default.

9         So you'll have 45 days to find new counsel and do that, or

10   if you don't find new counsel, you'll have to undertake it

11   either through Mr. Hecht or on your own.

12        Now, I will say that while I understand some of what has

13   gone on, both between counsel and client, and with respect to

14   counsel's situation, and I'm appreciative especially of the

15   latter, the circumstances that counsel faced, I find

16   unacceptable what the result has been.  The way that counsel and

17   client have dealt with each other, and the way that they, either

18   individually or collectively, have dealt with the plaintiff and

19   plaintiff's counsel and the Court, and their responsibilities in

20   this lawsuit, is simply unacceptable.  And you need to keep that

21   in mind as we're proceeding.

22        I would not -- I am not prepared to enter costs, and

23   Mr. Hecht referred to this this morning -- I'm not prepared to

24   enter costs at this time because I don't know what I'm going to

25   do with respect to the default.  But if I'm convinced to vacate

1    the default, I will consider at that point imposing costs as an

2    alternative sanction for some of the conduct that has occurred

3    in this case.

4        Now, I know that this is not entirely satisfactory to some

5    of you, particularly to the plaintiff and the plaintiff's

6    counsel, because we're mired in failings that emanate from the

7    defendant and his counsel, but yet the impact is largely on the

8    plaintiff.  And I will bear that in mind and take that into

9    account as I'm attempting to shepherd this case to a just

10   resolution.

11       Speaking of which, Mr. Greenberg, just refresh me, because

12   I probably have been somewhat aware of this in the past, but

13   just ballpark-wise, how much money was involved at the outset,

14   not with respect to any interest, but how much money in terms of

15   either nonpaid wages or nonpaid overtime were we talking about?

16   Just approximately.  I'm not holding you to any specific figure.

17   Are we talking about $10,000, are we talking about $350,000, or

18   are we talking about $2-1/2 million?

19       MR. GREENBERG:  Your Honor, I believe there -- I'm

20   embarrassed not to know.  I think there are 10 or 11 plaintiffs

21   in this case.  Mr. Azamar himself -- and I'm going by the

22   affidavits we filed with our initial motion for judgment by

23   default -- is probably owed between 15 and 17.  I think the rest

24   of these folks are owed anywhere from $700 to $2,000.  So in

25   total, I think we're talking about 25 to $30,000.

1       Now, what I would also say is that is before imposition of

2    statutory allowable damages, which could be up to two or three

3    times that amount.  And what's most significant in this case is,

4    in addition to the award of attorneys' fees and costs, which

5    this court would use the Laffey matrix and the lodestar

6    approach, so I would say that the attorneys' fees and costs

7    aspect of this case is probably most significant to any

8    calculation of a settlement amount, which puts me in an odd

9    situation, but --

10       THE COURT:  That's what happens.  That's what happens

11    when these matters go on and turn into the kind of dispute-laden

12    litigation that this has.  It winds up being very costly.  And

13    that in part is my message, and it's a message more or less to

14    you, Mr. Stern, that this has probably already been expensive in

15    terms of the exposure, and it will become increasingly expensive

16    because of the building costs of the litigation.

17       That may prevent any sensible resolution through mediation

18    or discussion.  But on the other hand, it also should be an

19    impetus for a sensible resolution.  And you need to keep that in

20    mind.  And you also need to listen to what others say.  Now, you

21    have to filter it appropriately, because depending upon who it's

22    coming from, they may have a particular perspective or a

23    particular representation.  Something that Mr. Greenberg says,

24    you have to filter it somewhat because he's representing the

25    client.  Something that Mr. Hecht says, less filtering because

1  he's representing your interests.

2      But when lawyers tell you that there are problems with

3  issues and that there's some risk that they won't be successful

4  on something, you need to take that into account, properly

5  assessing it to the best of your abilities, and filtering it

6  somewhat depending on the source, but you need to take that into

7  account.

8      And I don't like this case.  And the reason I don't like

9  this case is because you don't like each other and it makes the

10 case very difficult for me.  But I can tell you, I'm not going

11 to ignore this case.  I'm not going to ignore it just because I

12 don't like it.  And I will issue the orders that need to be

13 issued.  I will impose the sanctions that need to be imposed.  I

14 will reach the resolution that is fair and just.  And everybody

15 needs to be on notice about that.

16     And the timelines that I've identified and the tasks that

17 I've identified, I will have no further countenance for failures

18 to do what someone is responsible for doing.  No more

19 finger-pointing, no more I didn't get messages.  There's a

20 failure of communication.  That's fine and dandy, but there's a

21 responsibility that comes, and the responsibility is going to be

22 placed on those who fail to live up to their obligations.

23     So, I will issue an order that sets out this.  And it's not

24 a very satisfactory situation, I am the first to concede.  But I

25 need a process to push this case forward, wherever it's going to

1    go.  And if it goes only to a confirmation of the default, then

2    so be it.  If it goes to a vacation of the default, I will

3    consider costs, we'll have a rearrangement perhaps of attorneys,

4    and we will push this case forward in a reasonable and prompt

5    fashion.

6         Mr. Hecht.

7         MR. HECHT:  Thank you, Your Honor.  Quick question.

8    Is there a prohibition on Mr. Stern filing -- assuming he gets

9    that Coverall complaint together, is there a prohibition against

10   either myself or new counsel filing that?

11        THE COURT:  No.  I will not prohibit you from doing so

12   if you are able to do so.  That would be a gesture of attention

13   to the lawsuit.  Even though at the moment there's the default,

14   you can go ahead and lodge that and we'll work that out,

15   depending upon what decision I make with respect to the default.

16        MR. HECHT:  Thank you for that clarification,

17   Your Honor.

18        THE COURT:  All right.  With that, anything further,

19   Mr. Greenberg?

20        MR. GREENBERG:  Thank you very much, Your Honor.

21        THE COURT:  Thank you.  Mr. Hecht, anything further?

22        MR. HECHT:  No, Your Honor.  Just thank you and

23   apologizing for being here so late.  There was a significant

24   problem with the Southeast entrance to the city.  Apparently

25   yesterday's floods washed out, I think they said 295 north.

1            THE COURT:  In all candor, my disappointment with your

2     being late was overcome by my pleasure at the fact that you were

3     here.

4            MR. HECHT:  Thank you.

5            THE COURT:  Mr. Stern, anything further you wish to

6     say?

7            MR. STERN:  No.  Everything right now, I'm happy right

8     now.

9            THE COURT:  All right.  Well, you're happy right now,

10    but you've got some work to do.  Thank you.

11       (Proceedings adjourned at 11:27 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

        I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.

                    _____
                    BRYAN A. WAYNE